UNITED STATE BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy No. 13-bk-44986 |
| 35th & Morgan Development Corp., | Chapter 7 |
| Alleged Debtor | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON
## CONTESTED INVOLUNTARY BANKRUPTCY PETITION

35th & Morgan Development Corp. ("35th & Morgan," or the "Alleged Debtor") is a single purpose real estate entity that was formed to own and develop into condominiums the former Spiegel headquarters and warehouse located at 35th Street & Morgan Street (the "Property") in the Bridgeport neighborhood of Chicago. Development work never truly started before the real estate collapse of 2007. The lenders, PNC Bank National Association ("PNC"), and FirstMerit Bank, National Association ("First Merit," together the "Banks") have since instituted a foreclosure proceeding against the property in the District Court for the Northern District of Illinois, an action that is still pending. On November 20, 2013, PNC and FirstMerit filed their petition for an involuntary Chapter 7 bankruptcy before the bankruptcy court. On January 22, 2014, Levenfeld Pearlstein LLC ("LP") joined the petition.

Alleged Debtor filed an Answer to the Involuntary Petition on December 10, 2013, objecting to the standing of the petitioning creditors. (Dkt. 25.) A motion to dismiss was filed, but later withdrawn, (Dkt. 37.), and the contested Involuntary Petition was set for trial. Alleged Debtor contends that none of the three petitioning creditors holds a claim "that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" as required by 11 U.S.C. § 303(b)(1). The petitioning creditors contend that their claims are not contingent or the subject of a bona fide dispute, and that in any case, Alleged Debtor has fewer than "twelve such holders, excluding any employee or insider," and thus only one qualified creditor need bring an involuntary petition. § 303(b)(2). Debtor alleges that it has more than twelve such holders.

Trial was held over four days beginning on March 10, 2014. After the parties rested, they made their final arguments in writing, and submitted proposed Findings of Fact and Conclusions of Law. Since many of the proposed Findings by both parties are uncontested, a number of them are adopted as part of the Court's Findings.

The Court now makes and enters the following Findings of Fact and Conclusions of Law. It includes a discussion of facts involving the standing of the three petitioning creditors and a number of asserted creditors whose qualifications under the statute are in dispute.

# FINDINGS OF FACT

## BACKGROUND OF THE ALLEGED DEBTOR

1. 35th & Morgan Development Corp. (the "Alleged Debtor") is a privately held corporation established and existing under the laws of the State of Illinois with a principal place of business at 4252 N. Cicero Ave., Chicago, IL 60641. (Joint Statement of Stipulated Facts [ECF 61, the "Stipulation"], ¶ 3.)

2. Dubin Holdings Inc. is a privately held corporation established and existing under the laws of the State of Illinois with a principal place of business at 4252 N. Cicero Ave., Chicago, IL 60641. (Stipulation, ¶ 25.)

3. Dubin Holdings Inc. owns at least a 99% interest in the Alleged Debtor. (Id.)

4. The David J. Dubin Revocable Trust owns at least 74.4% of Dubin Holdings Inc. (Id., ¶ 26.)

5. Mr. Dubin is an officer of Dubin Holdings, Inc. (Id., ¶ 27.)

6. The Alleged Debtor's principal asset is a parcel of real estate located on West 35th Street, Chicago, Illinois 60609, which has situated on it a building that is designated as a Chicago landmark building (the "Property"). (Id., ¶ 3.)

7. The Alleged Debtor is a single purpose entity with no known assets other than the Property. (Id., ¶ 4.)

8. The Alleged Debtor intended to redevelop the Property into condominiums and a parking structure. (Id., ¶ 9.)

9. The Property is currently vacant and there are no tenants of the Property. (Id.)

10. The Property has no running water, is in a state of disrepair, is uninhabitable and needs significant improvements. (Spado Testimony.)

11. The Property is the subject of a pending building code Complaint filed by the City of Chicago. (Alleged Debtor Trial Exhibit ["Alleged Debtor Tr. Ex."] No. 62.)

12. The Property generates no income. (Dubin Testimony.)

13. The Alleged Debtor's principal has stated under oath that the Property is worth $3,950,000. (PNC Trial Exhibit ["PNC Tr. Ex."] No. 63 at p. 3.)

14. As of December 31, 2013, there was a combined balance of $55.25 in all Bank accounts belonging to the Alleged Debtor. (Stipulation, ¶ 38.)

### The Loan Transactions with the Banks

15. On January 25, 2007, the Alleged Debtor obtained loans from National City Bank and Midwest Bank and Trust Company ("Midwest Bank" and together with National City Bank, the "Original Lenders"). (Stipulation, ¶ 5.)

16. The terms of the loans were documented in a Loan Agreement dated as of January 25, 2007 (the "Loan Agreement") entered into between the Alleged Debtor and the Original Lenders, with National City Bank acting as administrative agent for the Original Lenders (the "Agent"). (Id.; see also Loan Agreement, PNC Tr. Ex. No. 1.)

17. The Loan Agreement provided for a total Loan Commitment of $37,268,794. (PNC Tr. Ex. No. 1 at p. 2.)

18. The loans were evidenced by separate promissory notes, one payable to the order of National City Bank in the principal amount of $17,000,000 "with maximum aggregate fundings of" $23,465,537.00 (the "Original National City Note"), and the other payable to the order of Midwest Bank in the principal amount of $10,000,000 "with maximum aggregate fundings of" $13,803,257 (the "Original Midwest Bank Note"). (Stipulation, ¶ 6; PNC Tr. Ex. Nos. 2 and 3.)

19. The maturity date of the Original National City Note and the Original Midwest Bank Note was January 25, 2010. (Id.)

20. Pursuant to the Loan Agreement, the promissory notes were secured by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (the "Original Mortgage") executed by the Alleged Debtor in favor of the PNC for the benefit of the Original Lenders. Pursuant to the Original Mortgage, the Alleged Debtor granted the Original Lenders a lien on the Property in order to secure the amounts owed under the Loan Agreement. (Stipulation, ¶ 7; PNC Tr. Ex. No. 4.)

21. The Original Mortgage was recorded on February 1, 2007 in the Office of the Cook County Recorder of Deeds as Document No. 0708242008. (Id.)

22. Mr. Dubin signed the Loan Agreement, the Original National City Note, the Original Midwest Bank Note, and the Original Mortgage (collectively the "Original Loan Documents," and together with subsequent modifications, the "Loan Documents") on behalf

of the Alleged Debtor in his capacity as its President, and was authorized to execute the Original Loan Documents on the Alleged Debtor's behalf. (Stipulation, ¶ 8.)

23. The purpose of the Original Loan Documents was to allow the Alleged Debtor to refinance its original financing of the purchase of the Property, and to provide a source of funding for development of the Property. (*Id.*)

24. Pursuant to the Original Loan Documents, sufficient amounts were funded to the Alleged Debtor to allow it to refinance its existing mortgage loan on the Property. (*Id.*)

25. Before May 22, 2008, the Alleged Debtor concluded that development of the Property was no longer feasible and communicated this to the Original Lenders and that it would not be prudent to begin construction on the project. (Stipulation, ¶ 10.)

26. Thereafter, the parties agreed to modify the Original Loan Documents to, inter alia, eliminate any further funding commitment by either National City Bank or Midwest Bank, by execution of amended notes to pay the amounts previously funded pursuant to the Loan Agreement, and to extend the maturity date to repay those amounts. (*Id.*)

27. On May 22, 2008, the parties entered into a First Amendment to Loan Agreement and Other Loan Documents (the "First Amendment"). (*Id.*; PNC Tr. Ex. No. 6.)

28. Pursuant to the First Amendment, the amended loan was evidenced by two amended promissory notes with maturity dates of May 22, 2009: (i) one payable to the order of National City Bank in the principal amount of $4,513,329.07 (the "Amended National City Note"), and (ii) one payable to the order of Midwest Bank in the principal amount of $2,654,899.44 (the "Amended Midwest Note".) The Amended National City Note and the Amended Midwest Note are collectively referred to herein as the "Amended Notes." (Stipulation, ¶ 10; PNC Tr. Ex. Nos. 7 and 8.)

29. PNC is in possession of the originally signed Amended National City Note. (PNC Tr. Ex. No. 7A.)

30. FirstMerit is in possession of the originally signed Amended Midwest Note. (PNC Tr. Ex. No. 8A.)

31. The Amended Notes each provides that "[t]his Note and all provisions hereof shall be binding upon Maker and all persons claiming under or through Maker, and shall inure to the benefit of Payee, together with its successors and assigns, including each owner and holder from time to time of this Note." (PNC Tr. Ex. No. 7, § 4(d); PNC Tr. Ex. No. 8, § 4(d).)

32. Pursuant to the First Amendment, any remaining obligation or commitment by National City Bank or Midwest Bank to fund additional amounts pursuant to the Loan Agreement was extinguished. (Stipulation, ¶ 10.)

33. The First Amendment states that "Borrower and Lender have agreed that the Loan will be recast as an acquisition loan with a maturity date of May 22, 2009, with no remaining availability." (PNC Tr. Ex. No. 6 at Recital D.)

34. The Amended National City Note and the Amended Midwest Note both state that "[n]otwithstanding anything to the contrary in the Prior Note, the Loan Agreement, or the other Loan Documents, Payee shall have no obligation, and has no commitment, to make or fund any additional loans to Maker." (PNC Tr. Ex. No. 7 at p. 1; PNC Tr. Ex. No. 8 at p. 1.)

35. In connection with the First Amendment, the Alleged Debtor executed a First Amendment to Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (the "First Mortgage Amendment"). (Stipulation, ¶ 11; PNC Tr. Ex. No. 9.)

36. The First Mortgage Amendment was recorded on June 6, 2008 in the Office of the Cook County Recorder of Deeds as Document No. 0815805055. (Id.)

37. Mr. Dubin signed the First Amendment, the Amended National City Note, the Amended Midwest Bank Note, and the First Mortgage Amendment on behalf of the Alleged Debtor in his capacity as its President, and was authorized to execute those documents on the Alleged Debtor's behalf. (Stipulation, ¶ 12.)

38. The maturity date of the Amended Notes was extended to November 1, 2010 pursuant to a Second Amendment to Loan Agreement and Other Loan Documents dated as of May 22, 2009 (the "Second Amendment"). (Stipulation, ¶ 13; PNC Tr. Ex. No. 10.)

39. In connection with the Second Amendment, the Alleged Debtor executed a Second Amendment to Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (the "Second Mortgage Amendment"). (Stipulation, ¶ 14; PNC Tr. Ex. No. 13.)

40. The Second Mortgage Amendment was recorded on November 13, 2009 in the Office of the Cook County Recorder of Deeds as Document No. 0931733069. (Id.)

41. Mr. Dubin signed the Second Amendment and the Second Mortgage Amendment on behalf of the Alleged Debtor in his capacity as its President and was authorized to execute the Second Amendment and the Second Mortgage Amendment on the Alleged Debtor's behalf. (Stipulation, ¶ 15.)

42. David Ruisch ("Mr. Ruisch") signed the Second Amendment on behalf of National City Bank. Mr. Ruisch was authorized by National City Bank to sign the Second Amendment on its behalf. (*Id.*, ¶ 16.)

43. In November 2009, National City Bank merged with and into PNC. (*Id.*, ¶ 17., PNC Tr. Exh. 14.)

44. Upon the merger, neither National City Bank nor PNC took the steps described in Section 17 (also referred to as "the Notice Provision") of the Loan Agreement. (Stipulation ¶ 16.)

45. In May 2010, pursuant to a Purchase and Assumption Agreement among the Federal Deposit Insurance Corporation ("FDIC"), as Receiver of Midwest Bank, and FirstMerit, FirstMerit purchased virtually all of the assets of Midwest Bank. (Stipulation, ¶ 18.)

46. Upon the transaction between the FDIC and Midwest Bank, neither Midwest Bank, the FDIC nor FirstMerit took the steps described in Section 17 of the Loan Agreement. (*Id.*)

47. Section 17 of the Loan Agreement provided,

> Any lender may ... at any time assign and delegate to one or more commercial banks or other financial institutions ... all or any fraction of that Lender's Loan Commitment ... when all of the following conditions have been met. ... Except as provided in Section 17.1(b), any attempted assignment and delegation not made in accordance with this Section 17.1(a) shall be null and void.

(PNC Tr. Exh. 1 at 43-44.) Section 17.1(b) does not exist.

48. The Alleged Debtor failed to pay the amounts due under the Amended Notes on or before their November 1, 2010 maturity date. (Stipulation, ¶ 19.)

49. On November 1, 2010, PNC's counsel sent a letter to the Alleged Debtor notifying it of an Event of Default under the Amended Notes. (*Id.*, ¶ 20; PNC Tr. Ex. No. 18.)

50. On November 10, 2010, PNC's counsel sent a letter to the Alleged Debtor demanding that the Alleged Debtor pay the amounts due and owing under the Amended Notes. (Stipulation, ¶ 21; PNC Tr. Ex. No. 18.)

51. The Alleged Debtor did not make payment as demanded in the November 10, 2010 letter. (Stipulation, ¶ 21.)

52. Since November 10, 2010, the Alleged Debtor has not made any payment of principal or interest pursuant to the Amended Notes. (*Id.*, ¶ 22.)

53. As of the Petition Date, the amount owed under the Amended National City Note was $5,504,612.98. (Ruisch Testimony.)

54. As of the Petition Date, the amount owed under the Amended Midwest Note was $3,238,007.62. (Maxwell Testimony.)

55. Alleged Debtor's contended the value of the Property was $3,950,000 in answer to an interrogatory by PNC in this case. (PNC Tr. Ex. No. 63 at p. 3).

56. PNC filed a lawsuit against the guarantors of the Amended Notes, including Mr. Dubin (the "Guaranty Proceeding.") (PNC Tr. Ex. No. 66.)

57. In the Guaranty Proceeding, Mr. Dubin argued that PNC "lack[ed] standing to pursue the claims set forth in the lawsuit because it is not the holder of the loan agreements, notes and guarantees..." (PNC Tr. Ex. No. 71 at p. 14, Second Affirmative Defense.)

58. Judge Kocoras rejected Mr. Dubin's standing argument. (PNC Tr. Ex. No. 68 at pp. 4-5.)

59. Judge Kocoroas thereafter entered a Judgment against Mr. Dubin in the Guaranty Proceeding. (PNC Tr. Ex. No. 69.)

60. On November 20, 2013, the Petitioning Bank Creditors filed an Involuntary Petition under chapter 7 of title 11 of the Bankruptcy Code against the Alleged Debtor in the United States Bankruptcy Court for the Northern District of Illinois. (Stipulation, ¶ 1.)

### LEVENFELD PEARLSTEIN

61. Levenfeld Pearlstein LLC ("LP") performed legal services for the Alleged Debtor, including representing it in litigation. (Dubin Testimony.)

62. LP filed an appearance on behalf of the Alleged Debtor in a lawsuit seeking to foreclose on the Property. (PNC Tr. Ex. No. 37; Dubin Testimony.)

63. LP has not been paid in full for the legal work that it performed for the Alleged Debtor. (Dubin Testimony.)

64. The Alleged Debtor listed LP as one of its "Creditors with Qualified Claims," and listed the amount owed as $66,040.83. (PNC Tr. Ex. No. 26 at p. 4.)

65. The Alleged Debtor listed LP in its "Amended List of Creditors with Qualified Claims," and listed the amount owed as $66,040.83. (Alleged Debtor Tr. Ex. No. 76 at entry 9.)

66. Though the Alleged Debtor indicated on its "Amended List of Creditors with Qualified Claims" that it disputed some of the claims in its "Amended List of Creditors with Qualified Claims," it did not so indicate with respect to LP.

67. LP's debt is unsecured.

68. On January 22, 2014, LP filed a "Notice of Joinder to Involuntary Petition," and joined the involuntary petition as the third petitioning creditor. (Stipulation, ¶ 2.)

OTHER ALLEGED CREDITORS

### Alleged Insiders

69. The Alleged Debtor's annual report filed with the Illinois Secretary of State for 2013 identifies Ariel Weissberg as its corporate Secretary. (PNC Tr. Ex. No. 70.)

70. Mr. Weissberg is the principal of Weissberg and Associates. (Weissberg Testimony.)

71. The bills that Weissberg and Associates submit for services rendered related to the Alleged Debtor are addressed to Mr. Dubin personally, and not to the Alleged Debtor. (Alleged Debtor Tr. Ex. No. 35; Weissberg Testimony.)

72. Ariel Weissberg testified that he was not and never acted as the Alleged Debtor's corporate Secretary, and that he does not know why he would be listed as Secretary in the Secretary of State's records. Mr. Weissberg's testimony is found to be credible.

73. Naganat Guru ("Mr. Guru") was, until December 2012, the Alleged Debtor's Chief Financial Officer. (Guru Testimony.)

74. Since that time, Mr. Guru has been acting as the Alleged Debtor's Chief Financial Officer and Consultant in an independent contractor capacity. (Stipulation, ¶ 24.)

75. Mr. Guru stopped being the Alleged Debtor's Chief Financial Officer because active development work by the 35th & Morgan had stopped by that time, and the services of a true Chief Financial Officer were no longer necessary. (Guru Testimony.)

76. Mr. Guru submitted an invoice in December 2013 to the Alleged Debtor in the amount of $25,000. (Guru Testimony; PNC Tr. Ex. No. 51.)

77. This invoice is the first and only invoice Mr. Guru has submitted to the Alleged Debtor, and the Alleged Debtor has not paid the invoice. (Guru Testimony.)

78. Mr. Guru was paid between $150,000 and $200,000 by an entity managed by Mr. Dubin's wife for work he did for others of Mr. Dubin's companies in 2013. (Guru Testimony.)

79. The Naganat Guru Revocable Trust owns at least 7% of Dubin Holdings Inc. (Stipulation, ¶ 28; see also Guru Testimony.)

80. Dubin & Associates, Inc. ("Dubin & Associates") is a privately held corporation established and existing under the laws of the State of Illinois with a principal place of business at 4252 N. Cicero Ave., Chicago, IL 60641. (Stipulation, ¶ 29.)

81. Mr. Dubin is the President and Secretary of Dubin & Associates. (Id., ¶ 30.)

82. Mr. Guru acts as the Chief Financial Officer and Consultant of Dubin & Associates in an independent contractor capacity. (*Id.*, ¶ 31.)

83. Dubin Does the Town Development Corp. is a privately held corporation established and existing under the laws of the State of Illinois with a principal place of business at 4252 N. Cicero Ave., Chicago, IL 60641. (*Id.*, ¶ 32.)

84. Dubin Does the Town Development Corp. owns 100% of Dubin & Associates. (Id.)

85. Mr. Dubin is an officer of Dubin Does the Town Development Corp. (*Id.*, ¶ 33.)

86. The David J. Dubin Revocable Trust owns at least 74.4% of Dubin Does the Town Development Corp. (Dubin Testimony)

87. Dubin Residential is an assumed name of Dubin & Associates, as reflected in the Secretary of State's records. (Stipulation., ¶ 35.)

88. Mr. Dubin is the President and Secretary of 3600 South Western Avenue Development Corp. (Id., ¶ 37.)

89. 3600 South Western Avenue Development Corp. is owned 100% by Dubin Holdings, Inc. (*Id.*)

90. Mr. Dubin is the managing member and majority owner of 3600 South Western Avenue Development LLC and controls its operations. (Dubin Testimony.)

## **Alleged Creditors Not Owed Payment**

91. The Alleged Debtor claims that it owes Chicago Scaffolding for scaffolding provided at the Property pursuant to invoices received in February 2012. (PNC Tr. Ex. No. 27A at pp. 8-11.)

92. Daniel Hyman of Millennium Properties R/E, Inc. ("Mr. Hyman"), was appointed Receiver of the Property by Judge Dow in the District Court foreclosure action on March 9, 2012. (PNC Tr. Ex. No. 64.)

93. Wanda Spado ("Ms. Spado") is an employee of Millennium Properties R/E, Inc., and works with Mr. Hyman in his role as Receiver for the Property. (Spado Testimony.)

94. When Mr. Hyman was appointed the Property's Receiver, there was scaffolding erected on the Property to protect common areas from falling debris. (Spado Testimony.)

95. As of March 2012, the company that provided the scaffolding – Chicago Scaffolding – had not been paid for the permits and scaffolding that it provided, and threatened to dismantle and remove the scaffolding if payments were not made. (Spado Testimony.)

96. Ms. Spado called Chicago Scaffolding, found out the amount due, and paid the amount in full – over $15,000 – in June 2012. (Spado Testimony; PNC Tr. Ex. No. 31.)

97. As of November 20, 2013, there was no money due and owing to Chicago Scaffolding for any goods or services related to the Property for any time period. (Spado Testimony.)

98. Mr. Dubin cannot recall the last time that Chicago Scaffolding demanded payment for services related to the Property. (Dubin Testimony.)

99. The Alleged Debtor claims that it owes National Construction Rentals pursuant to an invoice dated November 16, 2011. (PNC Tr. Ex. No. 27A at p. 39.)

100. On February 23, 2012, National Construction Rentals signed a "Final Waiver of Lien," which stated that, upon signing the waiver, National Construction Rentals was not due any money for services related to the Property. (PNC Tr. Ex. No. 41.)

101. On behalf of the Receiver, Ms. Spado paid the first installment of the 2012 property taxes for the Property in March 8, 2013, and Ms. Spado paid the second and final installment of the 2012 property taxes for the Property in July 2013. (Spado Testimony; PNC Tr. Ex. No. 59.)

102. As of November 20, 2013, there were no unpaid property taxes due and owing on the Property. (Spado Testimony.)

103. The first installment for the 2013 property taxes on the Property was not due until March 4, 2014. (Spado Testimony.)

104. Ms. Spado timely paid the first installment for the 2013 property taxes assessed on the Property. (Spado Testimony.)

105. There are no unpaid water bills relating to the Property. (Spado Testimony.)

106. There currently is no water supplied by the City of Chicago to the Property. (Spado Testimony.)

107. As of November 20, 2013, there were no unpaid water bills pertaining to the Property. (Spado Testimony.)

108. The City of Chicago has not been sending correspondence to the Alleged Debtor demanding payment for any water bills. (Dubin Testimony.)

109. As of November 20, 2013, there were no unpaid fines of any type assessed by the City of Chicago relating to the Property. (Spado Testimony.)

110. The City of Chicago has filed a *lis pendens* against the property for alleged violations of the Building Code. (Dubin Testimony.)

111. The City of Chicago has asserted violations of the Building Code in Housing Court. (Dubin Testimony.)

112. The Receiver has never sent any bills of any type, including bills for services or for his fees, to the Alleged Debtor. (Spado Testimony.)

113. The Receiver submits his bills related to the Property to PNC, and PNC pays those bills upon receipt. (Spado Testimony.)

114. As of the Petition Date and as of the date of the trial, all invoices for Receiver fees have been paid by PNC. (Spado Testimony; Ruisch Testimony.)

**Creditors of Other Dubin Related Entities Without Claims Against Alleged Debtor**

115. The Alleged Debtor's standard mode of operations was for either Dubin & Associates or Dubin Residential to arrange services from vendors or enter into contracts for services related to the Property. (Dubin Testimony.)

116. The Alleged Debtor did not receive invoices from or send payments to the following vendors; instead, either Dubin & Associates or Dubin Residential received the invoices from these parties and paid them with checks drawn by Dubin & Associates on a Dubin & Associates' account:

- Alert Protective Service
- Daspin Aumet
- Masuda Funai
- Miller Cooper & Co., Ltd.
- Much Shelist
- National Construction Rentals
- Ulmer Berne LLP

117. The Alleged Debtor did not receive invoices from or send payments to the following vendors, instead, eithter Dubin & Associates or Dubin Residential received invoices:

- The Blueprint Shoppe, Inc.
- Carol Taxman Ltd.
- Chicago Scaffolding, Inc.
- City Landscape, LLC
- J & M Fence
- Nixon Peabody LLP
- Thomson Coburn
- Novogradac & Company LLP
- David A. Bonoma, Ltd.

118. The following service providers did work for many of Mr. Dubin's companies, and when they were paid, they were paid by Dubin & Associates.

- Mohammad Musheer Ahmad
- Matthew Walaszek

119. The following service providers provided services to the Alleged Debtor pursuant a contract with Dubin Residential.

11

›  Daspin Aumet                             ›  Novogradac & Company LLP

120.  RKF Law Offices does not have an engagement letter with the Alleged Debtor. (Feldman testimony)

121.  RKF Law Offices submitted a reprint of an invoice to the Alleged Debtor on February 18, 2014 relating to services performed pre-petition. (PNC Tr. Exh. 61.)

122.  Robert Feldman, the principal of RKF Law Offices, testified that the reprint was accurate as to all details of the original invoice, including who the invoice was addressed to.

123.  Mr. Feldman was asked whether he had altered the addressee of the invoice at the request of Mr. Dubin after Mr. Dubin's Deposition on February 12. He denied making any such alteration. Robert Feldman is found to be credible.

OTHER CREDITORS

### Hartshorne Plunkard, Ltd.

124.  In 2006, Hartshorne Plunkard, Ltd. ("Hartshorne") (Alleged Debtor Tr. Ex. No.76 at entry 7) entered into a contract with Dubin Residential to provide services for the Property. (PNC Tr. Ex. No. 33; Hartshorne Testimony; Dubin Testimony.)

125.  A change order to the contract with Hartshorne was signed by Dubin Residential. (PNC Tr. Ex. No. 34; Hartshorne Testimony; Dubin Testimony.)

126.  Hartshorne sent invoices for services performed pursuant to the contract to Dubin Residential, not the Alleged Debtor. (PNC Tr. Ex. No. 35; PNC Tr. Ex. No. 27A at p. 30; Hartshorne Testimony; Dubin Testimony.)

127.  On behalf of the Alleged Debtor, Mr. Dubin swore, under penalty of perjury, that the Alleged Debtor never made any payment to Hartshorne because the Alleged Debtor did not have a contract with Hartshorne. (PNC Tr. Ex. No. 36 at pp. 3-4.)

128.  In 2010, Hartshorne offered to enter into a contract directly with the Alleged Debtor, but the Alleged Debtor never signed this contract. As a result, Hartshorne continued to operate under the original contract that it entered into with Dubin Residential. (Alleged Debtor Tr. Ex. No. 50; Hartshorne Testimony; Dubin Testimony.)

129.  Hartshorne has asserted a mechanics lien claim against the Property. (Alleged Debtor Tr. Ex. No. 77.)

### Ag3 Advisory Services

130.  Ag3 Advisory Services ("Ag3") provided real estate consulting services relating to the Property in 2009. (Silvers Testimony)

131.  Ag3 provided the services on behalf of the Alleged Debtor. (Silvers Testimony)

132. Ag3 was not paid for this work. (Silvers Testimony)

133. Ag3 sent Dubin a reprint of what is alleged to be the original invoice addressed to the Alleged Debtor on February 18, 2014, after the filing of this case, and after Mr. Dubin was deposed in this case. (Silvers Testimony)

134. Ag3's representative, Mr. Silvers could not recall whether Dubin had instructed him to alter the invoice to be addressed to the Alleged Debtor rather than to some affiliate of the Alleged Debtor. (*Id.*)

135. Mr. Silvers testified that when he reprinted the invoice, he only changed the date to reflect the date of the reprint, and made no other changes. Mr. Silvers is found to be credible on this point.

### The Engineering Studio

136. The Engineering Studio (Alleged Debtor Tr. Ex. No. 76 at entry 22) signed a written contract with the Alleged Debtor. (Alleged Debtor Tr. Ex. No. 71.)

137. The Engineering Studio performed work under the contract on behalf of the Alleged Debtor.

138. The Engineering Studio's owner, Eric Stein, testified that he believes he is owed money by the Alleged Debtor. (Stein Testimony.)

Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### JURISDICTION

Jurisdiction lies over this Petition under 28 U.S.C. § 1334. The case and pleadings related to it are referred here by Internal Procedure 15(a) of the District Court for the Northern District of Illinois. This matter is a contested involuntary bankruptcy petition, and is therefore a core proceeding. 28 U.S.C. § 157(b)(2)(A) & (O). A bankruptcy judge may hear and finally decide any core proceeding. 28 U.S.C. § 157(b)(1). A contested involuntary petition "stems from the bankruptcy itself," and may constitutionally be decided by a bankruptcy judge. *Stern v. Marshall*, 131 S.Ct. 2594, 2618 (2011).

### INVOLUNTARY BANKRUPTCY FILINGS

Section 303(b) of the Bankruptcy Code provides,

> An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,325 of such claims;

11 U.S.C. § 303(b).

A "claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" will be referred to here as a "Qualified Claim," and the holder of Qualified Claim as a "Qualified Creditor."

In the Seventh Circuit, "if there is a bona fide dispute as to either the law or the facts, then the creditor does not qualify and the petition must be dismissed." *Matter of Busick*, 831 F.2d 745, 750 (7th Cir. 1987) (quoting *In re Lough*, 57 B.R. 993, 997 (E.D. Mich. 1986)). There must be an objective basis for the existence of a bona fide dispute. *Id.* A bona fide dispute exists if the debtor raises some substantial factual or legal issue. *In re Rimmel*, 946 F.2d 1363, 1365 (8th Cir. 1991). "However, '[t]he statute does not require the court to determine the outcome of any dispute, only its presence or absence. Only a limited analysis of the claims at issue is necessary.'" *Buisick* at 750. Even though only a limited analysis is necessary, an inquiry into the objective basis of a bona fide dispute "necessarily requires some analysis of the issues" of the allegedly bona fide dispute. *Rezko v. Sirazi*, 08 C 5433, 2009 WL 1507660 at *5 (N.D. Ill. May 29, 2009). "Once the petitioning creditor establishes a prima facie case that its claim is not subject to a bona fide dispute, the burden shifts to the debtor to present evidence of a bona fide dispute." *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1544 (10th Cir. 1988). "Otherwise, any debtor could defeat an involuntary petition under § 303(h)(1) by merely asserting that a bona fide dispute exists." *In re Taylor*, 75 B.R. 682, 684 (N.D. Ill. 1987). Further, "the mere existence of pending litigation or the filing of an answer is insufficient to establish the existence of a bona fide dispute." *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1066 (9th Cir. 2002) Nor does the mere pleading of an affirmative defense establish a bona fide dispute. *Id.*

### PNC AND FIRSTMERIT HOLD QUALIFIED CLAIMS

Alleged Debtor contends that PNC and FirstMerit do not hold Qualified Claims because their claims are subject to a bona fide dispute. The Alleged Debtor asserts that neither PNC nor FirstMerit has standing to enforce the Loan Agreements because neither complied with the Notice Provision contained in Section 17 of the Loan Agreement, which was to be triggered upon assignment of any "Loan Commitment" (a defined term in the Loan Agreement). The issue of the Banks' standing was raised before Judge Dow in the pending foreclosure lawsuit in federal district court, but not yet decided there. *PNC Bank, N.A. v. 35th & Morgan Development Corp., et al*, Case No. 11-C-09255 (the "Foreclosure Proceeding").

Section 17 of the Loan Agreement provides,

> Any lender may ... at any time assign and delegate to one or more commercial banks or other financial institutions ... all or any fraction of that Lender's Loan Commitment ... when all of the following conditions have been met. ... Except as provided in Section 17.1(b), any attempted assignment and delegation not made in accordance with this Section 17.1(a) shall be null and void.

Neither Bank complied with the Notice Provision when each succeeded to rights of the predecessor banks; they contend that the Notice Provision does not apply. Alleged Debtor argues that a bona fide dispute as to the legal effect of the Notice Provision exists because the Banks claim that payment is past due on the Amended Notes, which the debtor disputes. They further support the existence of the bona fide dispute by pointing to unresolved litigation pending before Judge Dow in the Foreclosure Proceeding on this issue.

Alleged Debtor argues that the Banks are not owed money under the Loan Documents because the Notice Provision applies whenever any portion of the monies defined as "Loan Commitment" in the Loan Agreement are transferred. It supports this argument with the definition of "Loan Commitment," term defined in the Loan Agreement as "the amount of the Aggregate Loan Commitment allocated to that Lender as set forth on Schedule *I*." (PNC Tr. Ex. 1 p. 6.) Aggregate Loan Commitment is further defined as, "the aggregate amount of the Lenders' Loan Commitments, of $37,268,794, which at the Loan Opening Date, is allocated among the Lenders as set forth on Schedule 1." (PNC Tr. Exh. 1 p. 2.) The Aggregate Loan Commitment was later amended in the First Amendment to Loan Agreement and Other Loan Documents to ("Amended Loan Agreement"), "the

aggregate amount of the Lenders' Loan Commitments, of $7,168,228.51," which represented the amount of money previously advanced.

Alleged Debtor's argument is without merit. The term, "Aggregate Loan Commitment" must be read in context of the Loan Agreement. The Loan Agreement uses the term "Aggregate Loan Commitment" to limit the amount of money the Banks were obliged to loan to 35th & Morgan in Section 4.1, which provides, "Borrower agrees to borrow from the Lenders and Lenders agree to lend to Borrower ... an aggregate sum equal to the lesser of ("the Loan") (i) the Aggregate Loan Commitment in the amount of $37,268,794; or ..." (PNC Tr. Exh. 1 p. 13.) The term "Aggregate Loan Commitment" was not used in Section 4.4 providing for the required payments by the borrower. (PNC Tr. Exh. 1 p. 17.)

Alleged Debtor's argument concerning the "Aggregate Loan Commitment" loses any plausibility when considered in light of the modification of the Loan Documents on May 22, 2008 when the parties agreed:

> Due to market conditions, Borrower and Lender have agreed that the Project is not economically feasible at this time, and therefore, Borrower and Lender have agreed that the Loan will be recast as an acquisition loan with a maturity date of May 22, 2009, with no remaining availability.

(PNC Tr. Exh. 6 p. 1.) To reflect the "no remaining availability" of future lending, the Amended Loan Agreement changed the Aggregate Loan Commitment to reflect the amount of money already loaned, thus discharging the Banks from any obligation to make any further loans to 35th & Morgan. The Notice Provision would still have applied to any assignment or transfer of the Loan Commitment, but since there was no longer any outstanding loan commitment once the loan was recast, the Notice Provision was of no practical effect.

In addition, the Amended Loan Agreement deletes Section 4.4 of the original Loan Agreement, the provision for repayment. (PNC Tr. Exh. 6 ¶ 1.14. at p. 3.) Original Section 4.4 directed the 35th & Morgan to repay the loan in monthly interest payments according to the Notes and Section 5.1 (on interest), or when a condominium unit was sold. (PNC Tr. Exh. 1 p. 17.) On the same day as the Modified Loan Agreement, Debtor also executed two Amended and Restated Promissory Note, one in favor of National City Bank, the other in favor of Midwest Bank (the "Amended Notes"). (PNC Tr. Exh. 7 & 8.) Both Amended Notes provide, "This Note and all provisions hereof shall be binding upon Maker ... and shall inure to the benefit of Payee, together with its successors and assigns, including each owner

and holder from time to time of this Note." (PNC Tr. Exh. 7 & 8 at ¶4(a) (identical).) No reference was made to any limitation on transfer, related to the Aggregate Loan Commitment or otherwise.

Even if the specific language in the Amended Notes is not read to control over the Notice Provision regarding the Aggregate Loan Commitment, the Aggregate Loan Commitment simply has no application to the Amended Notes. The Amended Notes provided, "Notwithstanding anything to the contrary contained in the Prior Note, the Loan Agreement, or the other Loan Documents, Payee shall have no obligation, and has no commitment, to make or fund any additional loans to Maker." (*Id.*) Neither Note conditions repayment based on notice regarding the "Aggregate Loan Commitment."

At trial, the Banks produced and tendered into evidence both signed original Amended and Restated Promissory Notes. (PNC Tr. Exh. 7A & 8A.) Both original Amended Notes were duly admitted. As holders of the Notes, both PNC and FirstMerit have claims. *See* 810 ILCS 5/3-301. As the Amended Notes are not subject to terms of the Notice Provision, there is no bona fide dispute as to the Banks' claims.

### PNC is Successor by Merger to National City Bank

It is undisputed that PNC and National City Bank merged in 2009. "In a merger, unlike an asset acquisition, the resulting firm automatically acquires all the rights, powers, franchises, liabilities, and fiduciary rights and obligations of the merging firms." *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 337 n.13 (1963). Thus, there was never any "assignment" of any kind. Therefore, PNC never breached the Notice Provision of the Loan Agreement, and thus there is no bona fide dispute as to whether PNC has a claim.

### LP HOLDS A QUALIFIED CLAIM NOT SUBJECT TO BONA FIDE COUNTERCLAIM

It is undisputed that Levenfeld Pearlstein LLC ("LP") performed legal services for the Alleged Debtor, including representing it in litigation. LP filed an appearance on behalf of the Alleged Debtor in a lawsuit seeking to foreclose on the Property. It is also undisputed that LP has not been paid in full for the legal work that it performed for the Alleged Debtor. Alleged Debtor contends that LP's claim is subject to a bona fide dispute because, as it argues, LP is not entitled to payment because LP committed legal malpractice. LP is asserted to have committed malpractice (1) by failing to raise the Notice Provision as a defense in the Foreclosure Proceeding and (2) by concurrently representing FirstMerit in another matter during the Foreclosure Proceeding.

Alleged Debtor did not address either supposed malpractice claim in its pretrial brief, thereby giving no pretrial notice of those claims and thereby preventing the other parties from investigating them. The Final Pretrial Order provided "Any legal claim, theory or argument not raised and thoroughly discussed in a party's trial brief with appropriate citations to legal authority will be deemed waived. The claim will not be considered and no evidence relevant to it will be admitted." (Dkt. 38, ¶ 9(c)) Therefore, at trial, when it sought to assert the malpractice argument, Alleged Debtor was barred in limine from introducing evidence to support that late blooming argument.

However, Alleged Debtor was given the opportunity to make offers of proof at trial through documents and witnesses to preserve its argument for possible appeal. The offers of proof were not admitted into evidence as violating the Pretrial Order. But even if the offers of proof had all been admitted into evidence, they would not have established a bona fide dispute as to LP's claim.

> In an action for legal malpractice the plaintiff must plead and prove that: the defendant attorney owed the plaintiff a duty of due care arising from the attorney-client relationship; that the defendant breached that duty; and that as a proximate result, the plaintiff suffered injury in the form of actual damages. Even if negligence on the part of the attorney is established, no action will lie against the attorney unless that negligence proximately caused damage to the client.

*Governmental Interinsurance Exch. v. Judge*, 221 Ill. 2d 195, 199 (2006) (internal quotations omitted).

First, there was no malpractice when LP did not raise the Notice Provision as a defense. "In cases involving litigation, no legal malpractice exists unless the attorney's negligence resulted in the loss of an underlying cause of action." *Id.* at 200. "Thus, a legal malpractice plaintiff must litigate a 'case within a case.'" *Id. See generally Blythe Holdings Inc. v. DeAngelis*, No. 13-2114 (7th Cir. Apr. 21, 2014) (requiring a showing of causation to prevail in a malpractice claim). As discussed above, there is no merit to the argument that the Notice Provision deprives the Banks of the right to receive payment under the Amended Notes, and thus no bona fide dispute.

Second, there was not sufficient evidence proffered in the offer of proof to establish the alleged malpractice arising from some possible conflict of interest. In the offer of proof, Mr. Dubin told of a telephone conversation in February, 2012 between Mr. Blackman and Mr. Schwartz, two lawyers at LP, himself, and possibly Naganat Guru. Mr. Blackman told

Dubin[1] that there could be a conflict of interest because of a prior representation of FirstMerit, and that they would be back in touch regarding the issue. No further offer of proof explained or expanded on this reported communication. Whatever it meant, there was no evidence proffered as to how some alleged actual conflict proximately caused harm, or any actual damages arising from any conflict. Alleged Debtor was not able to show a bona fide dispute as to the conflict of interest because Alleged Debtor has proffered no evidence as to several necessary elements of legal malpractice.

Thus, even if Alleged Debtor had not been barred by the pretrial order from "sandbagging" petitioning creditors by introducing evidence regarding its previously undisclosed assertions of legal malpractice, it was not able to prove a bona fide dispute. The malpractice argument had no substantive merit and LP remains a qualified creditor.

In the end, there are three qualified creditors bringing this involuntary petition: PNC, FirstMerit, and LP.

### LP's Joinder was Proper

Alleged Debtor also objects to LP's joinder as improper because its joinder pleading was not verified, and thus not subject to the penalty of perjury, and because LP failed to make any pretrial submissions, barring it from offering evidence.

As for LP's joinder, there is no requirement for a creditor joining in an involuntary petition brought by others to do so by verified pleading. Rule 1008, F.R. Bankr. P., provides for verification by the original creditors, but does not require a joinder to an involuntary petition to be verified or filed under penalty of perjury. While the official form for filing an involuntary petition requires an original petitioning creditor to "declare under penalty of perjury," the requirement in an official form does not have force of law. *In re Simmons*, 237 B.R. 672 (1999). Moreover, this issue was not raised by the Alleged Debtor for many months after LP filed its joinder.

As for LP's failure to make pretrial submissions in compliance with the pretrial order, that failure would have barred LP from offering any evidence if it had tried to do so at trial. But that did not bar the other creditors from offering evidence at trial concerning LP.

---

[1] Mr. Blackman's words would not be hearsay if offered into evidence because they are an admission of LP, a party opponent. Rule 801(c)(2)(D), F.R. Evid.

### ALLEGED DEBTOR HAS FEWER THAN TWELVE QUALIFIED CREDITORS

In response to the involuntary petition, Alleged Debtor has submitted, and later amended, a list of creditors with qualified claims. (Dkt. 54-2.) Thirty-three creditors were listed.[2] Petitioning Creditors have contested many of the creditors on the list, some as already paid, some as insiders, and some as being owed payment by some entity related to the Alleged Debtor but not the Alleged Debtor.

### (1) Creditors Who are not Owed Payment from Alleged Debtor

Creditors who have been paid in full do not hold claims. As established by testimony, the following alleged creditors have been paid in full, and therefore do not hold claims:

- Chicago Scaffolding was paid in full in June 2012. As of November 20, 2013, there was no money due and owing to Chicago Scaffolding for any goods or services related to the Property for any time period.
- National Construction Rentals signed a "Final Waiver of Lien," which stated that, upon signing the waiver, National Construction Rentals was not due any money for services related to the Property.
- The Receiver submits his bills related to the Property to PNC, and PNC pays those bills upon receipt. As of the Petition Date and as of the date of the trial, all invoices for Receiver fees have been paid by PNC.

### (2) Claims by Insiders

The statute on involuntary cases provides: "if there are 12 such holders, excluding any employee or *insider* of such person ..." an involuntary petition may be brought by one or more petitioning creditors, rather than three or more. § 303(b)(2). Insider is defined term in the Code. Insiders include an "officer of the debtor," a "person in control of the debtor," or an "affiliate, or insider of an affiliate as if such affiliate were the debtor." § 101(31)(B)(ii), (B)(iii), (E). Affiliate is defined as an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor," or a corporation so owned. § 101(2)(A) & (B).

David Dubin is an officer of the Alleged Debtor, as well as the person in control of the debtor as its president. David Dubin is an insider of the Alleged Debtor.

---

[2] In addition, Alleged Debtor included Dubin Consulting, 3600 S. Western Ave. Development Corp., 3600 S. Western Project LP, 3600 S. Western Properties Corp. and 3600 South Western LLC as creditors in its post-trial Proposed Findings of Fact and Conclusions of Law. Since these entities were not disclosed in any pretrial submissions, and no evidence was adduced at trial regarding those entities, they will not be considered.

Dubin Holdings Inc. owns at least a 99% interest in the Alleged Debtor. The David J. Dubin Revocable Trust owns at least 74.4% of Dubin Holdings Inc. Therefore, Dubin Holdings Inc. and the David J. Dubin Revocable Trust are affiliates and thus insiders of the Alleged Debtor, as are any insiders or affiliates of Dubin Holdings Inc. or the David J. Dubin Revocable Trust.

The David J. Dubin Revocable Trust owns at least 74.4% of Dubin Does the Town Development Corp. Mr. Dubin is an officer of Dubin Does the Town Development Corp. Therefore, Dubin Does the Town Development Corp. is an insider of the Alleged Debtor, as are any corporations owned by Dubin Does the Town Development Corp.

Dubin Does the Town Development Corp. owns 100% of Dubin & Associates. Therefore, Dubin & Associates is an insider of the Alleged Debtor.

The reference to "Dubin Residential" in the Alleged Debtor's list of creditors is a reference to Dubin Residential Communities Corporation. Mr. Dubin is the President of Dubin Residential Communities Corporation and, either directly or indirectly, is the majority owner of Dubin Residential. Therefore, Dubin Residential is an insider of the Alleged Debtor.

3600 South Western Avenue Development Corp. is owned 100% by Dubin Holdings, Inc. Mr. Dubin is the President and Secretary of 3600 South Western Avenue Development Corp. Therefore, 3600 South Western Avenue Development Corp. is an insider of the Alleged Debtor.

Naganat Guru is the former Chief Financial Officer of the Alleged Debtor, and serves as acting Chief Financial Officer as an independent contractor. Mr. Guru was paid between $150,000 and $200,000 by an entity managed by Mr. Dubin's wife for work he did for others of Mr. Dubin's companies in 2013. The Naganat Guru Revocable Trust owns at least 7% of Dubin Holdings Inc. While a Chief Financial Officer is certainly an officer, it is less clear that an acting Chief Financial Officer is as well. The definition of insider uses the word "includes," which should be construed as "not limiting." § 102(3). The totality of involvement of Mr. Guru with the Alleged Debtor and in entities that are affiliates of the Alleged Debtor leads to the conclusion that Mr. Guru is an insider of the Alleged Debtor.

### (3) Creditors with Qualifying Claims

There are four creditors the petitioning creditors agree have qualified claims against the Alleged Debtor: PNC, FirstMerit, LP, and The Engineering Studio.

In addition, there is a claim of Cook County for real estate taxes. Although all taxes due and owing have been paid, "Illinois property taxes are due the year after the year in which they accrue, and a lien in favor of the county automatically arises at the beginning of the year in which the taxes accrue." *In re LaMont*, 740 F.3d 397, 400 (7th Cir. 2014). Thus, Cook County property taxes have been accruing even though they are not immediately due. A "claim" in bankruptcy includes a right to payment regardless of whether it is liquidated or unliquidated, matured or unmatured. 11 U.S.C. § 101(5)(A). In order for a creditor to hold a qualified claim, the claim must not be "contingent as to liability or subject of a bona fide dispute as to liability or amount." § 303(b)(1). Thus, an unmatured claim may count. Since there is no contingency, nor bona fide dispute, Cook County holds a qualified claim for property taxes.

Also, the City of Chicago has a qualified claim against the Debtor. Even though all water bills have been paid, and there is no current water service to the Property, the City of Chicago has a pending building code dispute with regard to the Property. The petitioning creditors have not shown lack of a bona fide dispute, even though there is some evidence in the record that Alleged Debtor has hired attorneys in the past to litigate the various pending building code disputes with the City of Chicago. As discussed earlier, merely contesting a legal action does not make a bona fide dispute, there must be some showing of merit. Therefore, City of Chicago must be considered a qualifying creditor.

Further, Hartshone Plunkard, Ltd. has asserted a mechanics lien against the Property. A mechanic's lien against the Alleged Debtor is a qualified claim against the debtor. A mechanic's lien is a claim because it is it seeks "an equitable remedy for breach of performance if such breach gives right to a rise to payment." § 101(5)(B). Neither party has argued that the mechanic's lien is contingent or subject to a bona fide dispute.

Alleged Debtor also lists Weissberg and Associates as a qualifying creditor. The petitioning creditors argue that Weissberg and Associates is an insider because the principal of Weissberg & Associates, Ariel Weissberg, is listed with the Secretary of State as Alleged Debtor's Secretary. Ariel Weissberg testified in court that he was not the Alleged Debtor's corporate Secretary, and that he does not know why he would be listed as Secretary in the Secretary of State's records. Mr. Weissberg's testimony is credible, therefore Weissberg & Associates has a qualified claim.

Ag3 and RKF Law Offices invoiced the Alleged Debtor directly for work performed by them pre-petition. Therefore, they are found to hold qualified claims.

Thus, Alleged Debtor has ten creditors holding qualified claims, exclusive of the creditors who are owed payment through Dubin & Associates. The remaining issue is whether the latter creditors hold their claims against the Alleged Debtor.

### (4) Creditors Who are Owed Payment by Alleged
### Debtor Through Dubin & Associates

Petitioning Creditors argue that the following parties were never creditors of Alleged Debtor, but rather creditors of Dubin & Associates (or Dubin Residential, which is an assumed name of Dubin & Associates) because the creditors sent their invoices to Dubin & Associates, and were paid by it rather than the Alleged Debtor:

| | |
|---|---|
| › Alert Protective Service | › Matthew Walaszek |
| › The Blueprint Shoppe, Inc. | › Miller Cooper & Co., Ltd. |
| › Carol Taxman Ltd. | › Mohammad Musheer Ahmad |
| › Chicago Scaffolding, Inc. | › Much Shelist |
| › City Landscape, LLC | › National Construction Rentals |
| › David A. Bonoma, Ltd. | › Nixon Peabody LLP |
| › J & M Fence | › Novogradac & Company |
| › Daspin Aumet | › Thomson Coburn LLP |
| › Masuda Funai | › Ulmer Berne LLP |

Alleged Debtor contends that these creditors were in fact creditors of the Alleged Debtor, even though invoices were sent to a different entity and a different entity paid those invoices because the Management and Service Agreement between the Alleged Debtor and Dubin & Associates created an agency relationship.

Under Illinois state law, "In any agency relationship, the principal can be legally bound by action taken by the agent where the principal confers actual authority on the agent." *Curto v. Illini Manors, Inc.*, 405 Ill. App. 3d 888, 892 (2010). Actual authority may be granted through a written contract. *Id.* "Implied authority … is actual authority circumstantially proved. It arises when the conduct of the principal, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's behalf."

The Management and Service Agreement provided that Dubin & Associates "shall administer the general operations of the Company [35th & Morgan] and shall staff or otherwise subcontract out each Project of the Company." (Alleged Debtor Tr. Exh. 49 p. 5.) For each project, Dubin & Associates was given power to:

> negotiate and administer all agreements and contracts to which the Company is a party or by which it is bound, including all agreements and contracts relating to the following: the purchase of real property,

23

> the development thereon of commercial and residential improvements,
> the design and construction of premises and improvements thereon;
> the financing of such purchase, development, design and construction;
> and the rental and sale of such commercial and residential property.

(*Id.*) Further, Dubin and Associates was to serve as general contractor for each project of the Alleged Debtor. (*Id.*)

"Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf." Restatement (Third) Of Agency § 1.01 cmt. c. Here, Dubin & Associates was given power to "negotiate and administer all agreements and contracts to which the Company is a party or by which it is bound," but not power to execute agreements and thereby bind 35th & Morgan to any new agreements.

The Management and Services Agreement does not make Dubin & Associates an agent for 35th & Morgan generally, but gives Dubin & Associates actual authority to negotiate and administer contracts on behalf of 35th & Morgan on a number of particular tasks to be undertaken in developing a project from purchase of land to the rental and sale of developed units. Specifically, it grants authority to engage in "general operations" and any administrative matters which might arise out of any "Project." It does not by its terms grant authority for Dubin & Associates to begin a "Project" or to sign and enter into contracts on behalf of 35th & Morgan.

Nor does Dubin & Associates have implied authority to act as agent for the Alleged Debtor and enter into contracts for it. "Implied authority is ... is actual authority circumstantially proved. It arises when the conduct of the principal, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's behalf." *Curto v. Illini Manors, Inc.*, 405 Ill. App. 3d 888, 892 (citations omitted). Dubin & Associates cannot have implied authority in the face of an explicit provision disclaiming an agency relationship. The Management and Services Agreement provided, "*Independent Contractor. It is expressly understood and agreed by the parties hereto that D&A and its agents are independent contractors and that the employees and agents of D&A are not employees or agents of the Company.*" (Alleged Debtor Exh. 49 p. 1, emphasis supplied.) There is nothing contradictory about this arrangement. As the Restatement of Agency explains, "the common term 'independent contractor' is equivocal in meaning and confusing in usage because some termed independent contractors are agents while others are nonagent service providers. Restatement (Third) Of Agency § 1.01 cmt. c (2006). The

24

delegation of specific tasks, together with a provision disclaiming agency generally leads to the conclusion that there was no actual authority.

Without an agency relationship, the existence of an internal agreement for reimbursement does not make creditors of Dubin & Associates into creditors of the Alleged Debtor. *In re Blaine Richards & Co. Inc.*, is instructive. 10 B.R. 424, 427 (Bankr. E.D.N.Y. 1981). In *Blaine*, the alleged debtor claimed that money owed by the alleged debtor's president on two charge cards was money owed by the company because of an agreement between the alleged debtor and its president for reimbursement. *Id.* The court held that, without more, an agreement between the company and the president did not obligate the company to pay the president's creditors. *Id.* The same approach applies here. The Management and Services Agreement between Dubin & Associates and the Alleged Debtor did not obligate Alleged Debtor to pay anyone except Dubin & Associates.

Therefore, the eighteen creditors listed here as creditors of Dubin & Associates are not qualified creditors of the Alleged Debtor. Thus, it is found that the Alleged Debtor has only ten qualified creditors. Therefore, under the Bankruptcy Code, only one petitioning creditor is required to bring this involuntary bankruptcy proceeding. § 303(b)(2).

### UNDISPUTED UNSECURED DEBT EXCEEDS $15,325

Based on the Alleged Debtor's valuation of the Property at $3,950,000, the claims of PNC and FirstMerit are greater than any lien held by either by $4,500,000. LP is owed $66,040.83, and the entire debt is unsecured. Thus, the amount of unsecured debt is more than the $15,325 required by § 303(b)(1) & (2).

### ALLEGED DEBTOR IS NOT PAYING DEBTS AS THEY BECOME DUE

Section 303 provides,

> [A]fter trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed only if—(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount.

§ 303(h)(1).

Not only is Alleged Debtor not paying its large secured debt owed to PNC and FirstMerit, its other creditors are not being paid either. Alleged Debtor made no showing that any debts are being paid as they become due. In fact, every creditor who testified testified that their debts were not being paid. The receiver's employee, Spado, testified that

the receiver had paid for scaffolding and taxes, but the receiver is not the Alleged Debtor. The Alleged Debtor is clearly not generally paying its debts as they become due.

## CONCLUSION

The petitioning creditors were entitled to bring the involuntary petition against Alleged Debtor. All three petitioning creditors hold qualified claims against the Alleged Debtor. Only one qualified petitioning creditor was necessary to bring the involuntary petition because the Alleged Debtor has only ten qualified creditors. All required elements have been proven, and all allegations by the Alleged Debtor are overruled.

Therefore the proceeding will be set for entry of an Order for Relief.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this     day of         2014